**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

LARETTA EARLS-ROZELLE,

Plaintiff,

v.

ERHARD R. CHORLÉ, JOHN BRAGG,
THOMAS R. JAYNE, and the RAILROAD
RETIREMENT BOARD,

Defendants.

No. 1:22-CV-03394

Judge Edmond E. Chang

**MEMORANDUM OPINION AND ORDER**

Laretta Earls-Rozelle works as a Supervisory Analyst for the Railroad Retirement Board (known by its acronym, the RRB), which is the federal agency that oversees retirement benefits for railroad workers. R. 95, DSOF ¶¶ 1, 4.[1] In January 2020, Earls-Rozelle unsuccessfully applied for a promotion. DSOF ¶¶ 16, 43. Earls-Rozelle sued the RRB, alleging that she was discriminated against based on her race, color, and gender under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. R. 48, Third Am. Compl. ¶¶ 40–65.[2] She also alleged wage discrimination under the Equal Pay Act, 29 U.S.C. § 206(d). Third Am. Compl. ¶¶ 66–74. The RRB now moves for summary judgment, arguing that the record evidence establishes that the claims

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number. Citation page numbers refer to the PDF page numbers for all exhibits except for depositions, the page numbers at the top of each page for depositions, and the page numbers at the bottom of each page for briefs. The Defendant's Local Rule 56.1 Statement of Facts is "DSOF," and the Plaintiff's is "PSOF."

[2]This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331.

must fail, even when the record is viewed in Earls-Rozelle's favor. R. 93, Defs.' Mot. For the reasons set forth below, the RRB's motion is granted.

## I. Background

In deciding the RRB's motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Except as otherwise noted below, the recitation of the factual background represents the undisputed facts as present in the parties' Local Rule 56.1 statements. The Court also must give the benefit of reasonable inferences to the non-movant, Earls-Rozelle, as to the summary judgment motion.

Laretta Earls-Rozelle is an African-American woman who describes herself as Black and having dark skin. Third Am. Compl. ¶¶ 10, 62; DSOF ¶ 2; R. 95-5, Exh. 6, Earls-Rozelle EEO Aff. at 2. In 1987, Earls-Rozelle accepted a position with the RRB as a claims examiner trainee at the GS-5 level ("GS" stands for General Schedule, the pay scale that applies to executive-branch employees). DSOF ¶ 1; R. 95-2, Exh. 3, Earls-Rozelle Dep. at 14:8–21. In 2017, Earls-Rozelle was promoted to her current position—GS-13 Supervisory Analyst within the Policy and Systems section—from her previous position, which was also at the GS-13 level. DSOF ¶¶ 1, 5; R. 95-10, DSOF Exh. 25, Request for Personnel Action at 24. In her 2019 performance review as a Supervisory Analyst, Earls-Rozelle received a 4 out of 4 on her communication skills. R. 102-2, PSOF ¶ 30; R. 102-4, Earls-Rozelle's 2019 Performance Evaluation at 1.

As a Supervisory Analyst, Earls-Rozelle was managed by Nathaniel Coleman, the Chief of the Compensation and Employer Services Center.[3] DSOF ¶ 6; Earls-Rozelle Dep. at 21:16–22:24. As Chief, Nathaniel Coleman reported to Kimberly Price, the Director of Policy and Systems. DSOF ¶ 7; R. 95-3, DSOF Exh. 4, Price Dep. at 11:11–13, 98:4–10. Price in turn reported to Crystal Coleman, the Director of Programs. DSOF ¶¶ 9, 11; Price Dep. at 98:19–20; R. 95-4, DSOF Exh. 5, Coleman Dep. at 14:22–23. Price and Coleman are both African-American women. DSOF ¶ 3; R. 95-6, DSOF Exh. 6, Price EEO Aff. at 3; R. 95-7, DSOF Exh. 8, Coleman EEO Aff. at 3. Price describes her skin color as "tan," and Coleman describes her skin color as "brown." DSOF ¶¶ 3, 64; Price EEO Aff. at 10; Coleman EEO Aff. at 3.

### Job Duties During Chief Vacancy

Nathaniel Coleman retired in December 2019, leaving vacant the position of Chief of the Compensation and Employer Services Center. DSOF ¶ 7; Earls-Rozelle EEO Aff. at 3. After Nathaniel Coleman's departure, Price asked managers, chiefs, and contractors to include Earls-Rozelle on communications to "prevent a log-jam or break down in communications of information needed by her and her staff." DSOF ¶ 8; Price EEO Aff. at 7. Between January 2020 and August 2020, when a new Chief was selected, Earls-Rozelle was not assigned or appointed as Acting Chief of

---

[3]To avoid confusion with another relevant high-level supervisor, Crystal Coleman, this Opinion will use Nathaniel Coleman's full name to refer to him.

Compensation and Employer Services. DSOF ¶ 51; R. 95-12, DSOF Exh. 31, Supp. to Earls-Rozelle EEO Aff. at 2; Price Dep. at 99:23–100:21.

Price testified that when Nathaniel Coleman retired, Price, Earls-Rozelle, and Gregory Frizell, another supervisor, "had to basically step up and do a little bit more than [they] were ordinarily doing following the absence of Mr. Coleman." DSOF ¶ 51; Price Dep. at 101:3–8.[4] For example, one of Nathaniel Coleman's responsibilities as Chief was to provide quarterly performance evaluations for Earls-Rozelle and Frizell. DSOF ¶¶ 53–54; Earls-Rozelle Dep. at 69:12–24; Earls-Rozelle's 2019 Performance Review at 1. When the Chief position was vacant, Price provided those evaluations for Earls-Rozelle and Frizell. DSOF ¶ 52; Price EEO Aff. at 9, 23–24. Price also signed off as the reviewer on the appraisals of the staff that Earls-Rozelle and Frizell supervised during this time. DSOF ¶ 52; Price Dep. at 91:21–93:12. Earls-Rozelle never provided a performance review of Frizell when the Chief position was vacant. DSOF ¶ 53; Earls-Rozelle Dep. at 70:1–3. And although she testified to supervising Sean McNeany, another senior compensation and communications specialist, PSOF ¶ 34; Earls-Rozelle Dep. at 64:22–65:6,[5] Earls-Rozelle confirmed that McNeany did not

---

[4]In her summary judgment response, Earls-Rozelle provided an "AI generated" definition of "creditable" as relevant to some of the added responsibilities that she said she shouldered. R. 102, Pl.'s Resp. MSJ at 11 n.4. The definition of "creditable" is neither here nor there in resolving the motion, but it is worth noting the impropriety of relying on an AI-generated answer with no further explanation or citation.

[5]The RRB contends that Earls-Rozelle's citation, to pages 97 and 98 of her deposition, does not support this factual proposition. R. 106, Defs.' Reply at 7. But it appears that Earls-Rozelle cited to pages 97 and 98 of the PDF, which corresponds with pages 64 and 65 of her deposition where the proposition does appear. The Court endeavors to navigate between Earls-Rozelle's inconsistent page citations, but Earls-Rozelle ultimately bears the burden of

receive performance appraisals from Nathaniel Coleman before the latter retired, R. 106-1, Defs.' Resp. to PSOF ¶ 34; Earls-Rozelle Dep. at 67:24–68:2.

**Hiring Process for Chief**

On December 20, 2019, the Chief position was posted as a GS-14/GS-15 role internally and as a GS-15 role externally. DSOF ¶ 16; R. 95-10, DSOF Exh. 22, Internal Job Posting at 2; R. 95-11, DSOF Exh. 23, First External Job Posting at 8. The internal role had a closing date of January 7, 2020. Internal Job Posting at 2. The external role closed on January 17, 2020. First External Job Posting at 8. Both job postings required "experience" that demonstrates a broad range of extensive knowledge and expertise of the Railroad Retirement Act (RRA) and/or Railroad Unemployment Insurance Act (RUIA)." PSOF ¶ 1; Internal Job Posting at 3; First External Job Posting at 9; R. 95-7, DSOF Exh. 9, Sanford EEO Aff. at 13. The internal job posting noted that candidates would be evaluated on factors including "[a]bility or experience in managing, training, and directing a subordinate staff of employees," "[a]bility to establish and maintain relationships with key individuals and groups within and outside the immediate work area, including rail employers, unions and other agencies (IRS, SSA, Treasury) in order to coordinate work activities," and "[k]nowledge of and experience in agency policies, programs and operations, related to the unemployment, sickness and railroad retirement programs," among others. DSOF ¶ 19; Internal Job Posting at 5–6.

---

providing "direct citation[s] to easily identifiable support in the record." *Gross v. Town of Cicero*, 619 F.3d 697, 702–03 (7th Cir. 2010).

On January 17, 2020, a new external posting replaced the original external posting, with a closing date of January 24, 2020. DSOF ¶ 20; R. 95-10, DSOF Exh. 24, Second External Job Posting at 16. The new posting did not include the requirement of experience with the RRA or the RUIA, and instead included qualifications such as "[k]nowledge and skill in providing leadership, administrative direction, execution, guidance and long-range planning for a bureau or agency," "[a]bility to plan, organize, and coordinate work for yourself and others," "[e]xperience serving as an expert in the technical and regulatory aspects of an organization's benefit program that requires integrating a wide variety of programmatic principles to solve complex problems," among others. DSOF ¶ 20; Second External Job Posting at 17. The Chief position had been reposted externally after Coleman had a "face-to-face conversation" with LeCherie Sanford, a human resources specialist, in which Coleman and Sanford mutually agreed to repost the position. PSOF ¶ 8; R. 102-3, Supp. to Sanford EEO Aff. at 6. Sanford explained that the position was reposted because she "noticed with the first posting, although [they] had applicants, none would be eligible due to the specialized experience being too RRB specific." Supp. to Sanford EEO Aff. at 6; *see also* DSOF ¶ 23; Sanford EEO Aff..[6]

---

[6]A senior RRB human resources specialist wrote in an email that "[i]t [was] understood in the federal HR community that [the U.S. Office of Personnel Management] does not want external announcements to be so agency specific that no one outside the agency would be eligible; there would be no point in posting a job outside if no one would be eligible." DSOF ¶ 22; R. 95-11, DSOF Exh. 27 at 13.

Earls-Rozelle applied for the Chief position on January 7, 2020. DSOF ¶ 16; R. 95-11, DSOF Exh. 30, Earls-Rozelle Application Materials at 26. There were ultimately five candidates who were interviewed for the Chief position: Earls-Rozelle, Lavette Fargo, Jeffrey Archbold, Zina Watkins, and Brenda Yette. DSOF ¶ 24; *see generally* Rs. 95-8 to -9, DSOF Exhs. 16–18, Candidate Interview Evaluation Forms. Other than Archbold, all candidates were African-American women. DSOF ¶ 24; Price Dep. at 40:21–41:21.

Archbold, who was a Senior Advisor in Criminal Investigations with the U.S. Department of Labor (DOL) Employee Benefits Security Administration when he applied for the Chief position, did not have knowledge or experience with the RRA or the Railroad Unemployment Insurance Act. DSOF ¶¶ 41–42, 44; R. 95-9, DSOF Exh. 19, Archbold Selection Justification at 25; *see generally* R. 95-12, DSOF Exh. 33, Archbold Resume at 24–32. Coleman had supervised Archbold at the DOL Employee Benefits Security Administration, where she last worked in 2013. DSOF ¶ 46; Coleman EEO Aff. at 6; Coleman Dep. at 33:1–6. She told Archbold about the Chief position and encouraged him to apply. DSOF ¶ 46; Coleman Dep. at 32:15–33:2.

Price conducted first-round interviews for the five candidates via telephone in July 2020. DSOF ¶ 25; Earls-Rozelle EEO Aff. at 3.[7] After the first round of

---

[7]Carl May, the Chief of the Financial Interchange Division, and Marguerite Dadabo, assistant general counsel, also attended the first-round interviews and scored the candidates based on their responses. DSOF ¶ 25; Price Dep. 33:6–35:4; *see generally* Candidate Interview Evaluation Forms.

interviews were completed, Earls-Rozelle's average score was lower than the average scores of Yette, Watkins, and Fargo, but higher than Archbold's average score. DSOF ¶ 26, Table A; *see generally* Candidate Interview Evaluation Forms. At this point, the top external candidate was one of the female candidates. DSOF ¶ 27; Price Dep. at 69:23–70:4. But when Price and Coleman discussed Price's top external candidate after the first round of interviews, Coleman expressed concerns about mistakes and missing information on the candidate's resume. DSOF ¶ 28; Coleman Dep. at 29:6–18. Coleman requested that Price schedule a second face-to-face interview with the candidate, which Coleman would also attend, to resolve the issues. PSOF ¶ 17; Coleman EEO Aff. at 4. Price and Coleman ultimately decided to interview all of the five candidates in person because Price wanted to be clear about her selection. DSOF ¶ 28; Coleman Dep. at 28:21–29:21, 29:10–21; Price Dep. at 45:16–20. Price prepared the second-round interview questions without Coleman's assistance, which differed for internal and external candidates. DSOF ¶ 28; Price Dep. at 56:21–22; R. 95-9, DSOF Exh. 20, Second In-Person Interview Questions at 27–31.[8] After each interview, Price and Coleman discussed which candidates had better answers, but Coleman did not participate in the scoring of the candidates. DSOF ¶ 38; Coleman Dep. at 39:17–41:2.

Following the second round of interviews, Price described Archbold's second interview as "decidedly better than his first." DSOF ¶ 32; Second In-Person Interview

---

[8]Price asked internal candidates, "What do you see as the biggest challenge facing [the Compensation and Employer Service Center] right now?" and external candidates, "If offered the job, how soon would you be available to start?" DSOF ¶ 34; Second In-Person Interview Questions at 27–31.

Questions at 28. Price noted that Archbold "seemed very knowledgeable and experienced with respect to distance learning," and said that his response about how he would handle staff who would likely resent his presence "was more detailed than others." DSOF ¶ 32; Second In-Person Interview Questions at 28. In contrast, Price described Earls-Rozelle's answer to the same question about resentful staff as "lacking specificity," and that Earls-Rozelle's interview demonstrated "[l]imited experience with distance learning based on RRB's own limited use." DSOF ¶ 33; Second In-Person Interview Questions at 27. Price also asked Earls-Rozelle about the "biggest challenge" facing the Compensation and Employer Services Center, and Earls-Rozelle discussed the unit's need for modernization. DSOF ¶ 34; Second In-Person Interview Questions at 27; Price Dep. at 48:20–49:3. Price and Coleman characterized this response as one that "stood out" because they instead saw the biggest challenge of the unit as everyone being past retirement age. DSOF ¶ 35; Coleman Dep. at 22:23–23:9; Price Dep. at 48:8–50:3. During her second interview, Earls-Rozelle also asked Price and Coleman what qualities they were looking for in candidates for the Chief position, and Coleman responded with, "Zen like Nathaniel Coleman." DSOF ¶ 30; Coleman Dep. at 42:20–43:14.

In August 2020, Price notified Earls-Rozelle in a telephone call that she had not been selected for the Chief position. DSOF ¶ 43; Price EEO Aff. at 5, 21. After the call, Price sent an email to herself that said that she "informed [Earls-Rozelle] that while she had a lot of valuable qualities, if [Price] found anything challenging, it was [Earls-Rozelle's] verbal and written communication skills and [Earls-Rozelle's]

9

interactions with her primary stakeholders which are the Board members and their assistants." DSOF ¶ 43; Price EEO Aff. at 21. A few days after informing Earls-Rozelle that she had not been selected, Price announced the selection of Archbold as Chief of Compensation and Employer Services for Policy and Systems. DSOF ¶ 45; Earls-Rozelle EEO Aff. at 6.

In October 2020, Earls-Rozelle filed a formal EEO complaint alleging race, color, sex, and age discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Equal Pay Act discrimination, 29 U.S.C. § 206(d). DSOF ¶ 62; R. 95-8, DSOF Exh. 12, Formal EEO Complaint at 2–5. Eventually, she filed this lawsuit, bringing theories of liability about discrimination on the basis of her race, color, and sex (but not on the basis of her age). *See generally* Third Am. Compl. The RRB now moves for summary judgment on all claims, arguing that Earls-Rozelle has failed to demonstrate a genuine issue of fact and that a reasonable jury must find against her. Defs.' Mot.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378

10

(2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704–705 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

### A. Local Rule 56.1

### 1. Earls-Rozelle's Objections to the RRB's Statement

As a threshold matter, the RRB objects to Earls-Rozelle's response to the RRB's Local Rule 56.1 Statement of Facts on the grounds that her objections were improper and that she failed to dispute the substance of nearly all the facts set forth by the RRB. R. 106, Defs.' Reply at 3. The RRB argues that as a result, its facts should be admitted. *Id.*

It is true that there are a multitude of violations of Local Rule 56.1 in Earls-Rozelle's response. Local Rule 56.1(d) provides that the parties must submit a statement of material facts and a statement of additional facts "consist[ing] of concise numbered paragraphs" which "should not contain legal argument." L.R. 56.1(d)(1), (4). If a party disputes an asserted fact, then the "party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material

11

controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." L.R. 56(e)(3). A general denial is insufficient to rebut a movant's factual allegations. *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000); *see also Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) (citing *Edward E. Gillen Co. v. City of Lake Forest*, 3 F.3d 192, 196 (7th Cir. 1993)) ("[A] mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material."). A district court has "discretion to require strict compliance with its local rules governing summary judgment," *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000), and "is not required to 'wade through improper denials and legal argument in search of a genuinely disputed fact,'" *Lamz*, 321 F.3d at 683 (quoting *Bordelon*, 233 F.3d at 529). Courts in this district have held that failure to comply with the requirements of Local Rule 56.1 results in the striking of responses and the admittance of factual allegations. *See De v. City of Chicago*, 912 F. Supp. 2d 709, 713–14 (N.D. Ill. 2012); *Creative Trade Grp., Inc. v. Int'l Trade All., Inc.*, 2009 WL 3713345, at *6 (N.D. Ill. Nov. 4, 2009).

In Earls-Rozelle's response to the RRB's Statement of Facts, there are numerous objections without any supporting citations. *See generally* R. 102-1, Pl.'s Resp. DSOF. Earls-Rozelle fully admits to the RRB's facts in Paragraphs 19, 22, 27, 57, 59, 62, 63, and 72, and partially admits to the facts in Paragraphs 14 and 21. *See id.*¶¶ 14, 19, 21–22, 27, 57, 59, 62–63, 72. For all other paragraphs, she objects not with citations but instead by asserting objections like numerosity, irrelevance, and calling for a legal conclusion. *See generally* Pl.'s Resp. DSOF.

12

On numerosity, Earls-Rozelle appears to argue that some of the RRB's separately numbered paragraphs contain multiple facts. But Local Rule 56.1 does not necessarily confine each paragraph to just one fact; instead, the Statement should be comprised of "*concise* numbered paragraphs." L.R. 56(d)(1) (emphasis added). It is true that movants should not cram an excessive number of facts in a single paragraph. But, at the same time, "a statement of material facts that presents one fact at a time per paragraph would not be an efficient manner in which to present a statement of material facts and would not be consistent with Local Rule 56.1." *Fishering v. City of Chicago*, 2009 WL 395462, at *2 (N.D. Ill. Feb. 18, 2009); *see also Nettles-Bey v. Burke*, 2015 WL 4638068, at *5 (N.D. Ill. Aug. 4, 2015) (same). Although asserting more than one fact per paragraph may "expose the party to an argument that Local Rule 56.1 is being abused," that type of abuse did not occur here. *Deffebaugh v. BNSF Ry. Co.*, 2015 WL 1230075, at *5 (N.D. Ill. Mar. 16, 2015). The RRB's facts are properly and efficiently organized based on discrete incidents with common, related factual details. Earls-Rozelle's objections to the RRB's Statement on the basis of numerosity are overruled.

On relevancy, it would be inefficient to go one-by-one through Earls-Rozelle's relevancy objections given that some of the parties' disputes are not material to summary judgment motion. In resolving the summary judgment motion (as detailed below), the Court sets forth only those facts and pieces of evidence that the Court "deems relevant[,] provided they are supported by the record." *Antech Diagnostics, Inc. v.*

*Downers Grove Animal Hosp. & Bird Clinic, P.C.*, 2013 WL 773034, at *1 (N.D. Ill. Feb. 28, 2013).

Finally, Earls-Rozelle objects to Paragraphs 88 and 95 of the Statement as calling for a legal conclusion. In Paragraph 88, the RRB lists the names of African-American women who held GS-15 or Senior Executive Service (SES) roles at the RRB while Price was an RRB employee, and states that Lavette Fargo, the other internal candidate for the Chief position, was promoted twice after Price left the RRB. DSOF ¶ 88; Price Dep. at 60:10–61:12, 68:14–69:12. In Paragraph 95, the RRB asserts that GS-14 and GS-15 positions are senior management roles and generally involve supervising other supervisors. DSOF ¶ 95; R. 95-13, DSOF Exh. 36, Coleman Decl. ¶ 5. Also, in Paragraph 95, the RRB stated that "[i]n Crystal Coleman's experience, management and leadership skills are key and more important than subject matter experience for GS-14 and GS-15 roles." DSOF ¶ 95; Coleman Decl. ¶ 5. Neither Paragraph 88 nor 95 contain a legal conclusion. Rather, both paragraphs contain factual assertions and describe testimony that has been properly submitted to the record. So Earls-Rozelle's objections to those paragraphs are overruled.

Despite Earls-Rozelle's bevy of objections to most of the Statement, few facts appear to be materially disputed. Earls-Rozelle purports to dispute Paragraphs 14 and 21. Pl.'s Resp. DSOF ¶¶ 14, 21. In Paragraph 14, the RRB states that Coleman did not decide who should be selected for the Chief position, and that Price made that decision without being influenced by anyone else. DSOF ¶ 14; Coleman EEO Aff. at 4; Price Dep. at 64:5–9, 65:19–66:1. In her objection to that paragraph, Earls-Rozelle

states, "[A]dmit that Price stated that she was not influenced by anyone about who to hire but deny these facts nonetheless," and cites to Coleman's EEO Affidavit and her deposition transcript generally. Pl.'s Resp. DSOF ¶ 14. But Earls-Rozelle does not "cite *specific* evidentiary material that controverts the fact" that she disputes, nor does she "concisely *explain* how the cited material controverts the asserted fact." L.R. 56.1(e)(3) (emphases added). So Paragraph 14 of the Statement is deemed to be admitted.

In Paragraph 21 of the Statement, the RRB asserts that "Price did not come up with" either posting for the Chief job, that "Coleman did not review the external posting and did not talk to human resources to ask them to change the external posting for the Chief role," and that "Coleman did not authorize a change in the external posting nor had any involvement in the external job reposting." DSOF ¶ 21; Price Dep. at 25:2–13; Coleman Dep. at 47:23–48:12. In her objection to this paragraph, Earls-Rozelle states, "[A]dmit that Coleman testified that she did not talk to human resources or have any involvement in the reposting but deny these facts nonetheless," and cites the supplement to Sanford's EEO Affidavit as evidentiary support. Pl.'s Resp. DSOF ¶ 21; Supp. to Sanford EEO Aff. at 6. Earls-Rozelle appears to be disputing the RRB's assertion that Coleman did not talk to human resources to ask for the external posting to be changed, as Sanford communicated to the EEO via email that the reposting was "mutually agreed upon" in a face-to-face conversation she had with Coleman. Supp. to Sanford EEO Aff. at 6. But nothing in Sanford's email to the EEO demonstrates that Coleman had *asked* Sanford for the external posting to be

15

changed—only that they both agreed to the reposting. Again, then, Paragraph 21 of the Statement must be deemed to be admitted.

### 2. The RRB's Objections to Earls-Rozelle's Statement

Next, the Court considers the RRB's objections to Earls-Rozelle's Rule 56.1(b)(3)(C) Statement of Additional Facts. In its reply brief, the RRB starts this argument by objecting to "Paragraphs 31, 32, and 40." Defs.' Reply at 6. The RRB then appears to discuss Paragraphs *30*, 31, and 40—not Paragraph 32—but the Court understands the RRB's discussion of Paragraphs 30 and 31 to target Paragraphs 31 and 32 of Earls-Rozelle's Statement. *Id.* For Paragraph 30 (which the Court understands to be Paragraph 31), the RRB challenges that paragraph because "Earls-Rozelle relied on her testimony as to something that Archbold supposedly said, which is hearsay." *Id.* Paragraph 30 does not rely on any statement of Archbold, and instead makes an allegation about Earls-Rozelle's 2019 performance evaluation, PSOF ¶ 30, which presumably is a business record and thus admissible under the hearsay exception, Fed. R. Evid. 803(6).Paragraph 31 makes an allegation that Earls-Rozelle was the expert Archbold deferred to when faced with employer questions about the RRA or RUIA, PSOF ¶ 31, and is a description of Archbold's conduct during meetings based on Earls-Rozelle's personal knowledge.[9]

---

[9]In Paragraph 31, Earls-Rozelle asserts that she was "generally the expert Archbold deferred to when an employer had a question concerning the RRA or RUIA." PSOF ¶ 31; Earls-Rozelle Dep. at 97:19–98:10. But the cited deposition testimony does not support the asserted fact. In the cited part of the deposition, Earls-Rozelle very generally asserted that she trained Archbold around three or four times per month "if we had to have any meetings with employers concerning the credi[ta]bility of service and compensation." Earls-Rozelle Dep. at 97:19–98:2. In the testimony, the most specific description that Earls-Rozelle

16

In Paragraph 32 (which the RRB's reply brief mislabels as Paragraph "31," Defs.' Reply at 6), Earls-Rozelle asserted that retiring Chief Nathaniel Coleman told here that if she wanted to do his job, then she would need supervisory experience and the RRB would bring in another employee to perform Earls-Rozelle's compensation and communication duties. PSOF ¶ 32. On that basis, Earls-Rozelle says, she accepted the Supervisory Analyst position. *Id.* In response, the RRB argues that "Earls-Rozelle *relied on her own testimony* as evidence of something Nathaniel Coleman allegedly told her," which the RRB labels as hearsay. Defs.' Reply at 6 (emphasis added). But reliance on a witness's "own testimony," *id.*, to introduce a statement is *not* what makes a statement hearsay. What makes a statement qualify as hearsay is that it was made by the declarant outside of trial (or hearing) testimony, Fed. R. Evid. 801(c)(1), and is offered to prove the fact asserted, Fed. R. Evid. 801(c)(2). Here, if no hearsay exemption or exception applies, then Nathaniel Coleman's out-of-court statement could qualify as hearsay—whether introduced via Earls-Rozelle's trial testimony or Nathaniel Coleman's own testimony about what he said to Earls-Rozelle. Arguably, however, the statement would enjoy the hearsay exemption for party admissions. Fed. R. Evid. 801(d)(2)(C), (D). As the Chief of a division, Nathaniel Coleman might very well be authorized to inform supervisees what they need to do to earn

---

provided was not specific at all, referring to teaching Archbold how to "submit a report" or to "explain what form would be needed." *Id.* at 98:4–9. That is a far cry from the asserted fact that Earls-Rozelle was generally the expert to which Archbold deferred when employers asked about the RRA or the Railroad Unemployment Insurance Act.

17

a promotion. Also, the promotion-advice statement arguably qualifies for the hearsay exception for statements of plan, Fed. R. Evid. 803(3). In any event, this is a sideshow for two reasons: first, the RRB is correct that the evidence is immaterial even if admissible. R. 106-1, Defs.' Resp to PSOF ¶ 32 ("The statement is also immaterial."). Nathaniel Coleman was not the decision-maker for the promotion that Earls-Rozelle sought, and his advice adds nothing to Earls-Rozelle's discrimination claim. Second, the cited page and lines of Earls-Rozelle's deposition testimony, PSOF ¶ 32 (citing Earls-Rozelle Dep. at 67:1–8), does not even relate to a conversation with Nathaniel Coleman; instead, it covers whether Earls-Rozelle performed a particular performance appraisal (she could not remember specifically).

Next, the RRB objects to Paragraph 40, Defs.' Reply at 6–7, which states that the RRB historically promotes from within the agency and then lists various individuals who allegedly received promotions in this way, PSOF ¶ 40. In support of that assertion, Earls-Rozelle cites to her *unsworn* statement, R. 102-5. But an unsworn statement, that is, a statement not signed under penalty of perjury, has no evidentiary value. *See Collins v. Seeman*, 462 F.3d 757, 760 n.1 (7th Cir. 2006) (excluding unsworn written summaries prepared from unsworn statements because they did not satisfy the requirements of Fed. R. Civ. P. 56(e)). Without supporting evidence, the Court will not consider the factual assertion in Paragraph 40.

The RRB also objects to Paragraphs 12, 27, 33, 34, and 39 as based on citations to evidence that do not support the stated propositions. Defs.' Reply at 7. The Court agrees in part. As to some paragraphs, the Court has already explained that Earls-

18

Rozelle cites deposition transcripts inconsistently, sometimes to the PDF page numbers and sometimes to the deposition page numbers. *See supra* n.5. In Paragraph 12, Earls-Rozelle alleges that Coleman was present during the second interview "when she changed her mind and determined that Archbold had the more complete set of skills to be successful as the chief." PSOF ¶ 12. But Earls-Rozelle cites to *Price*'s deposition transcript—not Coleman's—for that proposition. *Id.* (citing Price Dep. 58:15–59:15). And Price's cited deposition testimony says nothing about Coleman's viewpoint, and instead describes *Price*'s view (after the second interview) that Archbold had the "greater or more complete set of skills to be successful" in the Chief position, as compared to Earls-Rozelle. Price Dep. at 59:12–15.

In Paragraph 27, Earls-Rozelle states that she was the most senior person in the unit of the Compensation and Employer Service Center for which the Chief position became vacant. PSOF ¶ 27. Again, the evidentiary material support that she cites—her own deposition transcript—does not support this assertion.[10] In Paragraph 33, Earls-Rozelle asserts that any employee working for a railroad in the United States "might have knowledge and experience working with the RRA and RUIA." PSOF ¶ 33. Like some other citations, another page citation reveals Earls-Rozelle's testimony, Earls-Rozelle Dep. at 41:11–18, but the cited fact is immaterial.

---

[10]The part of Earls-Rozelle's deposition transcript cited to support Paragraph 27 discusses which other individuals Earls-Rozelle supervised in Nathaniel Coleman's absence and whether she provided performance appraisals for McNeany while the Chief position was vacant. Earls-Rozelle Dep. at 66:3–20. And even on PDF page number 66, the cited passage does not support the proposition that she was the most senior person, only that her prior role was very similar to her role of Supervisory Analyst. *Id.* at 35:14–16.

19

Although Earls-Rozelle suggests that *only* railroad employees might have knowledge of the acts, *see* Pl.'s Resp. MSJ at 6–7 & n.3, she also testified that anyone could "read about the Act," Earls-Rozelle Dep. at 41:15–18. Finally, in Paragraph 39, Earls-Rozelle asserts that "[i]ndividuals generally supervise employees with a lower grade level," and cites Coleman's EEO Affidavit as support. But the page Earls-Rozelle cites provides only an anecdote of one GS-14 employee supervising lower-grade-level employees, so her statement of the fact that this is "generally" the case is left unsupported. To the extent that this anecdote can be strung together with others, it is not the Court's job to find evidence for a party in the record. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 898 (7th Cir. 2018) ("It [is] … the plaintiff['s] responsibility to point us to any evidence that would have supported [an] essential element of their claim."). For all those reasons, Paragraphs 12, 27, and 39 of Earls-Rozelle's Rule 56.1 Statement of Additional Facts are excluded. Paragraph 33 contains immaterial facts, and the Court has described the material dispute about Paragraph 34.

## B. Title VII Discrimination

Turning to the merits, Earls-Rozelle argues that when the RRB hired Archbold as Chief instead of granting her the promotion, it discriminated against her because of her gender, race, and color under Title VII. Third Am. Compl. ¶¶ 40–65. As detailed below, even when the record is viewed in Earls-Rozelle's favor, the RRB has established the non-discriminatory motives for its employment decisions, and there is no genuine dispute: the agency did not act out of discriminatory intent.

Title VII of the Civil Rights Act of 1964 makes it illegal for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *Runkel v. City of Springfield*, 51 F.4th 736, 742 (7th Cir. 2022), *abrogated in part on other grounds by Paterakos v. City of Chicago*, 147 F.4th 787, 796 n.1 (7th Cir. 2025). To survive summary judgment, Earls-Rozelle's discrimination claim must be supported by evidence that would permit a reasonable factfinder to find that her gender, race, or color motivated the refusal to promote her to Chief. *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1040 (7th Cir. 2023); *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

At the summary judgment stage, Earls-Rozelle may present her case in two ways. Both methods can be deployed; they are not mutually exclusive. First, Earls-Rozelle can survive summary judgment by "generally present[ing] enough evidence from which a reasonable jury could find that [the RRB] discriminated against [Earls-Rozelle] because" of her gender, race, or color. *Gamble v. County of Cook*, 106 F.4th 622, 626 (7th Cir. 2024). If Earls-Rozelle proceeds this way, then she can defeat summary judgment by offering enough circumstantial evidence that would allow a reasonable jury to find that she was the victim of discrimination; there would be no need to show a prima facie case. *Ortiz*, 834 F.3d at 765. In other words, the question simply would be whether the evidence "permit[s] a reasonable factfinder to conclude that [her] race, ethnicity, sex, religion, or other proscribed factor caused the … adverse employment action." *Id.*

21

Second, Earls-Rozelle may rely on the burden-shifting framework established in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973). To establish a prima facie case under *McDonnell Douglas*, Earls-Rozelle must offer evidence that (1) she belongs to a protected class; (2) she met the RRB's legitimate employment expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees without her protected characteristics were treated more favorably. *Lane v. Stericycle, Inc.*, 162 F.4th 866, 874 (7th Cir. 2025) (citing *Gamble*, 106 F.4th at 626). If Earls-Rozelle does so, then the RRB "must articulate a legitimate, nondiscriminatory reason" for the adverse employment action. *Id.* (cleaned up).[11] If the RRB articulates that type of reason, then the burden of proof shifts to Earls-Rozelle, and she "must prove that the [RRB's] justification was pretext for a decision made on prohibited criteria." *Id.* (cleaned up). Earls-Rozelle must do so by "present[ing] evidence that supports an inference that the [RRB] was intentionally dishonest when it gave its nondiscriminatory reason." *Id.* (cleaned up). As explained next, neither path reveals a genuine issue of material fact.

### 1. Direct Method

On the direct method, the Seventh Circuit has "identified three broad types of circumstantial evidence that will support an inference of intentional discrimination," including "ambiguous or suggestive comments or conduct; better treatment of people

---

[11]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020) (citing *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)). As discussed below, even with the benefit of reasonable inferences in her favor, Earls-Rozelle has not offered enough evidence to refute the RRB's proffered reasons for hiring Archbold for the Chief position.

First, Earls-Rozelle relies on Price's statement to an EEO investigator that her (Price's) own skin tone was "Tan" and Earls-Rozelle's skin tone was "Brown." DSOF ¶ 77; R. 95-2, DSOF Exh. 2, Pl.'s First Resp. to Interrogatories ¶ 4. According to Earls-Rozelle, this statement meant that Price saw "a real clear distinction between colors." DSOF ¶ 79; Earls-Rozelle Dep. at 58:19–59:7. But Price provided these statements about her own skin tone and Earls-Rozelle's skin tone in *response* to follow-up questions from the EEO investigator.[12] DSOF ¶ 79; Price EEO Aff. at 10. In that crucial context, the statements are not at all suggestive of color discrimination, and do not support an inference of intentional discrimination.

Earls-Rozelle also relies on Crystal Coleman's statement during the second interview for the Chief position that the agency was looking for someone "[z]en like Nathaniel Coleman" as evidence of discrimination. DSOF ¶¶ 30, 76; Coleman Dep. at 42:20–43:14; R. 95-2, DSOF Exh. 1, Pl.'s Supp. Resp. to Interrogatories ¶ 3. But

---

[12]The follow-up question from the EEO Investigator was prompted by Price's initial statement that she did not understand the questions about Earls-Rozelle's and her own "color." Price EEO Aff. at 3.

Coleman was describing how Nathaniel Coleman approached his job when she made this comment; there is no suggestion that a reference to "zen" meant that Crystal Coleman intended to hire only a Caucasian or male candidate. DSOF ¶ 30; Coleman Dep. at 56:18–57:5. Coleman testified that she meant that Nathaniel Coleman "was always very calm and collected in his approach," and that "[h]e would think through any questions or any concerns and be very thorough and logical in his approach to answering questions." DSOF ¶ 30; Coleman Dep. at 43:16–21. She also testified that, of the female candidates for the Chief position, she believed that Lavette Fargo demonstrated this "zen" quality. DSOF ¶ 30; Coleman Dep. at 45:19–46:4. Though Earls-Rozelle testified that she interpreted Coleman's comment that the agency was looking for someone "[z]en like Nathaniel Coleman" as meaning "[z]en like a man," DSOF ¶ 31; Earls-Rozelle Dep. at 58:5–16; Formal EEO Compl. at 4, the plain meaning of "zen" simply does not imply the male gender.[13] The statement that the RRB was looking for someone "[z]en like Nathaniel Coleman" to fill the Chief position is not ambiguous or suggestive conduct supporting an inference of gender discrimination.

Earls-Rozelle also argues that Coleman tried to conceal her involvement in the second external posting for the Chief position, which omitted the requirement of

---

[13]"Zen" is defined as (1) "a Japanese school of Mahayana Buddhism that teaches self-discipline, deep meditation, and the attainment of enlightenment by direct intuitive insight into a self-validating transcendent truth beyond all intellectual conceptions and typically expresses its teachings in paradoxical and nonlogical forms" and (2) "an adherent of Zen." Webster's Third New Int'l Dictionary 2657 (4th ed. 1976).

24

knowledge of the RRA and Railroad Unemployment Insurance Act. Pl.'s Resp. MSJ at 3–4. But Coleman did not review the external posting and did not ask human resources to change the external posting for the Chief position, nor did she authorize a change in the external posting. DSOF ¶ 21; Coleman Dep. at 47:23–48:17. In response, Earls-Rozelle relies on the Supplemental EEO Affidavit of human resources specialist Le'Cherie Sanford, which says that Sanford and Coleman had a face-to-face conversation about reposting the external posting. Pl.'s Resp. MSJ at 3; PSOF ¶ 8; Supp. to Sanford EEO Aff. at 6. But Coleman never denied that the conversation happened; instead, she testified that she did not remember speaking with anyone in human resources and—crucially—*convincing* them to change the requirements in the job posting. DSOF ¶ 21; Coleman Dep. at 47:23–48:8. Without any further concrete factual detail from Sanford (or from some other witness who knows the content of the Coleman-Sanford conversation), the record evidence does not show that Coleman tried to hide her involvement in the reposting. So Coleman's role in the reposting for external candidates is not evidence of pretext.

Next, Earls-Rozelle argues that the elimination of the RRA- and RUIA-knowledge qualification from the second external posting was done to help Archbold, and thus the elimination is evidence of better treatment of a similarly situated person. Pl.'s Resp. MSJ at 5; *Joll*, 953 F.3d at 929. But the RRB has produced evidence to show that the reason for the elimination was to broaden the pool of applicants. In her EEO Affidavit, Sanford explained that the RRA- and RUIA-knowledge qualification for the external posting was removed "so that it would be equal and fair to

25

everyone" because "[n]o one who has not worked in the RRB would have that experience, so it was taken out and rewritten to be equal and fair to any candidate who would like to apply." DSOF ¶ 23; Sanford EEO Aff. at 13. A senior human resources specialist in the RRB also separately confirmed to the EEO investigator that the Office of Personnel Management "does not want external announcements to be so *agency specific* that no one outside of the agency would be eligible; there would be no point in posting a job outside if no one would be eligible." DSOF ¶ 22 (emphasis added); R. 95-11, DSOF Exh. 27, Chin Email at 13. Earls-Rozelle offers only her own speculation to rebut this nondiscriminatory reason for the elimination of the qualification.

Earls-Rozelle also claims that Coleman tried to hide her involvement in the interview and selection process. Pl.'s Resp. MSJ at 7–8. As discussed earlier, nothing in the record suggests that Coleman tried to hide her involvement in the second round of interviews. DSOF ¶¶ 28, 30, 38; Coleman EEO Aff. at 4 (describing how she sat in on the second interviews and provided impressions on the candidates based on a review of the resumes and interview responses); Coleman Dep. at 22:8–12, 27:18–28:4, 29:2–21, 40:5–22 (discussing her involvement in the second-round interviews). And Earls-Rozelle does not cite any record evidence showing that Coleman actively tried to hide her involvement in the hiring process for the Chief position.

Moving on, Earls-Rozelle argues that the reasons given by Price and Coleman for passing over her for the Chief position are dishonest and pretextual. Pl.'s Resp. MSJ at 5–9. Those reasons are (1) Earls-Rozelle's limited experience with distance

26

learning based on the RRB's own limited use; (2) Earls-Rozelle's lack of experience in important managerial areas by comparison to Archbold; and (3) Earls-Rozelle's oral and written communication skills and interactions with the Board members and their assistants, which Price found challenging. *Id.*; DSOF ¶¶ 39, 42–43; Second In-Person Interview Questions at 27; Price EEO Aff. at 21. The RRB supplied those reasons with a nondiscriminatory rationale. First, distance learning was important for the Chief position because there was a push to complete training remotely due to the COVID-19 pandemic and the high turnover in the railroad industry (leading to a need for more frequent trainings). DSOF ¶ 37; Price Dep. at 86:14–89:16. Managerial experience and leadership were also skills that Price evaluated candidates for because the Chief was a supervisory role. DSOF ¶¶ 20, 42; Price EEO Aff. at 5. Finally, Price explained that there were instances where Earls-Rozelle provided responses to questions that showed that she was not "reading the room" in a way that allowed her to answer questions without embarrassing attendees in a meeting. DSOF ¶ 43; Price Dep. 76:7–77:16. Although Earls-Rozelle may not personally agree with these justifications, she does not point to any evidence that demonstrates that the reasons provided by Price and Coleman for her non-selection were "intentionally dishonest." *Lane*, 162 F.4th at 874 (cleaned up).

Finally, Earls-Rozelle argues that Archbold's hiring, which broke from office precedent, and Price's justification for not promoting Earls-Rozelle because of her communication skills, are dishonest. Pl.'s Resp. MSJ at 8–9. As discussed in Part III.A.2, the assertion that the RRB historically promotes from within is not supported

27

by admissible evidence, so the Court cannot consider this fact. On Price's justification for skipping over Earls-Rozelle, Earls-Rozelle argues that Price informed her that she had not been selected for the role because her oral and written communication skills were "deficient." *Id.* at 9. Earls-Rozelle asserts that Price's justification is inconsistent with Earls-Rozelle's pre-vacancy performance review, which scored her performance of "[c]ommunication [a]ctivities and [t]echnical [e]xpertise" at 4 out of 4. PSOF ¶ 30; Earls-Rozelle's 2019 Performance Evaluation at 1.[14] But Price did not describe Earls-Rozelle's communication skills as "deficient"—instead, she described them as "chal-lenging" in the context of Earls-Rozelle's interactions with "primary stakeholders[,] which are the Board members and their assistants." Price EEO Aff. at 21; *see also* DSOF ¶ 43; Price Dep. at 76:7–77:16 (describing Earls-Rozelle's communication skills in the context of meetings with board members and not generally). Based on the rec-ord evidence, Price's justifications for passing over Earls-Rozelle are not pretextual. For all these reasons, the direct method fails.

### 2. Indirect Method

To resist summary judgment via a prima facie case, Earls-Rozelle must first establish a case of prima facie case with evidence that: "she was (1) a member of a protected class, (2) qualified for the position, (3) rejected for the position, and (4) that the employer selected someone outside the protected class who was similarly or less qualified." *Kinney v. St. Mary's Health, Inc.*, 76 F.4th 635, 646 (7th Cir. 2023). "If

---

[14]According to the Performance Rating Sheet, a 4 is "[o]utstanding." Earls-Rozelle's 2019 Performance Evaluation at 1.

28

[Earls-Rozelle] makes out a prima facie case by meeting each of these elements, the burden shifts to the [RRB] to articulate (not to prove) a legitimate, nondiscriminatory reason for the promotion decision." *Id.* And if the RRB meets that burden, then Earls-Rozelle must offer evidence that the RRB's explanation for the non-promotion was pretextual, or "not merely wrong but false." *Id.*

Earls-Rozelle meets the first three elements of the prima facie case: she is a member of a protected class, she was qualified for the position sought, and she was rejected for the position. The remaining question is whether Earls-Rozelle provided enough evidence to show that Archbold was similarly or less qualified than her at the time of his hiring. Put another way, Earls-Rozelle must show (with the benefit of reasonable inferences) that the comparison of her qualities to Archbold's qualities is "so favorable … that there can be no dispute among reasonable persons of impartial judgment that [she] was clearly better qualified for the position at issue." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180 (7th Cir. 2002) (quoting *Deines v. Tex. Dep't of Protective & Regul. Servs.*, 164 F.3d 277, 279 (5th Cir. 1999)). Although an irrational decision can qualify as circumstantial evidence of pretext, at bottom courts cannot "sit in judgment as super-personnel departments" overseeing hiring decisions, even if the decisions are "mistaken or perplexing or silly." *Brill v. Lante Corp.*, 119 F.3d 1266, 1272 (7th Cir. 1997) (citing *Kralman v. Ill. Dep't of Veterans' Affs.*, 23 F.3d 150, 156 (7th Cir. 1994)).

Earls-Rozelle's sole argument for why Archbold was less qualified for the Chief position is because he had no knowledge or experience with the RRA or Railroad

Unemployment Insurance Act. Pl.'s Resp. MSJ at 5–7. Indeed, the RRB does not contest the fact that Archbold had no knowledge or expertise with the RRA or RUIA at the time of his hiring. Defs.' Resp. to PSOF ¶ 2. But courts "do not tell employers what the requirements for a job must be," "even if those qualifications change." *Schaffner v. Glencoe Park Dist.*, 256 F.3d 616, 621 (7th Cir. 2001) (cleaned up). The fact that the RRB changed its qualifications for external candidates by removing knowledge of the RRA or RUIA is, generally speaking, a business decision that the Court should not second guess. *See Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 435 (7th Cir. 2005) (citing *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 785 (7th Cir. 2004)) ("[T]he court is not a super-personnel department intervening whenever an employee feels he is being treated unjustly." (cleaned up)). Price considered Archbold's lack of experience with the RRA and RUIA, but she testified that she believed that subject-matter experience was "not the most important attribute nor indicator of success" for a chief-level role. DSOF ¶ 42; Price EEO Aff. at 5. Price acknowledged Earls-Rozelle's subject-matter experience with the RRA and RUIA, but explained that "[Earls-Rozelle's] experience in important *managerial* areas by comparison, was wanting, even when compared to the other internal candidate." DSOF ¶ 42; Price EEO Aff. at 5 (emphasis added). And Archbold had been a supervisor since at least 2011 (giving him around nine years of supervisory experience before the August 2020 decision), whereas Earls-Rozelle only became a supervisor in December 2017. DSOF ¶ 1, 44;Request for Personnel Action at 24; Archbold Resume at 24. Earls-Rozelle has not provided sufficient evidence to create a genuine issue of

30

material fact as to whether Archbold was similarly or better qualified for the Chief position.

Even if Earls-Rozelle had set forth a prima facie case, the RRB has offered nondiscriminatory reasons for hiring Archbold, which Earls-Rozelle failed to show are pretextual. "Pretext is a 'lie, specifically a phony reason for some action.'" *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006) (quoting *Russell v. Acme–Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995)). To demonstrate pretext, Earls-Rozelle must offer evidence that (1) the RRB's "nondiscriminatory reason was dishonest"; and (2) that the RRB's "true reason was based on a discriminatory intent." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 403 (7th Cir. 2008) (quoting *Brown v. Ill. Dep't of Nat. Res.*, 499 F.3d 675, 683 (7th Cir. 2007)). Contemporaneous with the hiring, the RRB justified selecting Archbold by pointing to his expertise and experience in employer payroll-and-taxation reporting and filing requirements, as well as in leadership, technical direction, achieving an organization's mission objectives, conducting criminal investigations, establishing and maintaining relationships with U.S. attorneys, county prosecutors, employers, and labor unions. DSOF ¶¶ 41–42, 44, 48; *see generally* Archbold Selection Justification at 25; Archbold Resume at 24–32. Archbold also demonstrated more familiarity than Earls-Rozelle with distance learning—an area of need for the RRB during the COVID-19 pandemic. DSOF ¶¶ 32–33, 37; Price Dep. at 88:3–89:24, 90:16–24. Price also found Earls-Rozelle's "experience in important managerial areas … wanting, even when compared to the other internal candidate." DSOF ¶ 42; Price EEO Aff. at 5. Finally, Archbold outperformed Earls-Rozelle in the

31

second-round interview. *Compare* DSOF ¶ 41, *and* Archbold Selection Justification at 25, *with* DSOF ¶¶ 33–35, *and* Second In-Person Interview Questions at 27. *See, e.g.*, *Groves v. South Bend Cmty. Sch. Corp.*, 51 F.4th 766, 771 (7th Cir. 2022) (explaining that the plaintiff's interview "did not go well" was an "entirely proper" subjective determination, "especially given the absence of anything in the record suggesting that considerations of [the plaintiff's membership in a protected class] influenced" the hiring decision). Nothing in the evidentiary record suggests that the RRB's proffered reasons for hiring Archbold were dishonest.

### 3. Cat's Paw Theory

To the extent that Earls-Rozelle argues that the RRB is liable under a cat's paw theory of liability, the evidentiary record does not support that theory of liability. The cat's paw theory of liability applies "when a biased supervisor who lacks decisionmaking power uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 461 (7th Cir. 2021) (cleaned up). "To survive summary judgment on such a theory, the plaintiff must provide evidence that the biased subordinate actually harbored discriminatory animus against the victim of the subject employment action, *and* evidence that the biased subordinate's scheme was the proximate cause of the adverse employment action." *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 711 (7th Cir. 2017) (cleaned up) (emphasis added).

Earls-Rozelle's cat's paw theory is as follows: Crystal Coleman allegedly hid her role in causing the external reposting of the Chief position for someone other than

the two African-American women who had applied and were deemed eligible as internal candidates, and then Coleman stepped in to alter the outcome and then denied doing so. Pl.'s Resp. MSJ at 3–4, 7–8. But there is no evidence that Coleman harbored some kind of discriminatory animus against Earls-Rozelle. As discussed earlier, *see* Part III.B.1, the only remark by Coleman that Earls-Rozelle relies on is that Coleman said "[z]en like Nathaniel Coleman" in describing what attributes Price and Coleman were looking for in a Chief. Earls-Rozelle fails to connect this statement to race or color, DSOF ¶ 31; Earls-Rozelle Dep. at 58:5–16, and for the reasons discussed earlier, this statement is not evidence of gender discrimination. So this theory of liability fails, and the RRB is entitled to summary judgment on the Title VII claims for race, color, and gender discrimination.

### C. Equal Pay Act

In Count Four of the Third Amended Complaint, Earls-Rozelle alleges that the RRB violated the Equal Pay Act. Third Am. Compl. ¶¶ 66–74.[15] The Equal Pay Act

---

[15]The RRB argues that Earls-Rozelle's Equal Pay Act claim is partially time-barred. R. 94, Defs.' Br. at 28–29. The statute of limitations for claims brought under the Equal Pay Act is typically two years after the cause of action accrued. 29 U.S.C. § 255(a). The limitations period can be extended to three years if the cause of action arises out of a willful violation of the Equal Pay Act. *Id.* The RRB asserts that Earls-Rozelle may only recover for Equal Pay Act violations between June 26, 2020 (two years from June 26, 2022) to August 16, 2020 (the day before Archbold started in the Chief position). Defs.' Br. at 28–29. In response, Earls-Rozelle states that she filed suit on June 28, 2022, and that she continues to be underpaid, so her Equal Pay Act claim extends from "the present back to June 28, 2020, or perhaps August 17, 2020." Pl.'s Resp. MSJ at 12. It appears, then, that both parties agree that the earliest date Earls-Rozelle can recover Equal Pay Act damages for is June 28, 2020. Although the RRB refers to June 26, the RRB also recognizes that Earls-Rozelle initiated this suit on June 28, 2022, so the Court assumes that the two-day discrepancy is merely a typographical error.

prohibits employers from paying men and women different rates for the same work at the same "establishment." 29 U.S.C. § 206(d)(1). To state a claim for discrimination under the Equal Pay Act, a plaintiff must offer evidence that "(1) higher wages were paid to a male employee, (2) for equal work requiring substantially similar skill, effort and responsibilities, and (3) the work was performed under similar working conditions." *Warren v. Solo Cup Co.*, 516 F.3d 627, 629 (7th Cir. 2008) (cleaned up). Earls-Rozelle does have enough evidence to show that higher wages were paid to a male employee, and the RRB concedes that their jobs were performed under similar working conditions. R. 94, Defs.' Br. at 23. The only remaining question is whether her job required substantially similar skill, effort, and responsibilities as Nathaniel Coleman's job while the Chief position was vacant.

To determine whether the work that a plaintiff performed was similar enough to a male employee's, "the crucial inquiry is whether the jobs to be compared have a common core of tasks; i.e., whether a significant portion of the two jobs is identical." *Jaburek v. Foxx*, 813 F.3d 626, 632 (7th Cir. 2016) (cleaned up). To make this determination, the Equal Pay Act specifies that the elements of skill, effort, and responsibility should be considered separately. *See* 29 U.S.C. § 206(d)(1). "Each of these elements must be met individually to establish a prima facie case." *Cullen v. Ind. Univ. Bd. of Trs.*, 338 F.3d 693, 698 (7th Cir. 2003) (citing 29 C.F.R. § 1620.14). If a plaintiff establishes a common core, the inquiry becomes "whether any additional tasks make the jobs substantially different." *Id.* (cleaned up).

34

Earls-Rozelle has not presented enough evidence to establish that her job shared a common core of tasks with the Chief position when that role was vacant. One of Nathaniel Coleman's responsibilities as Chief was to provide quarterly and annual performance reviews for Earls-Rozelle and Frizell, and to review evaluations made by Earls-Rozelle and Frizell of the employees they supervised. DSOF ¶ 52; Price Dep. at 91:18–92:10, 92:15–93:12. Earls-Rozelle never prepared a performance review for Frizell, DSOF ¶ 53; Earls-Rozelle Dep. at 70:1–3. And she does not present evidence that she ever reviewed Frizell's evaluations of employees supervised by Frizell; instead, it was Price who took over those duties. DSOF ¶ 52; Price Dep. at 92:19–93:12. Earls-Rozelle also offers no evidence that she oversaw investigations; reviewed decisions about reconsideration and appeals of the amount of service and compensation; coordinated review and comment on legislation, regulations, or policy proposals; or prepared rules and regulations—all of which were duties of the Chief. DSOF ¶¶ 55, 70; R. 95-11, DSOF Exh. 28, Chief of Compensation Position Description at 15–18; Pl.'s Supp. Resp. to Interrogatories ¶ 13; Pl.'s First Resp. to Interrogatories ¶ 13; Supp. to Earls-Rozelle EEO Aff. at 2–4.

Even if Earls-Rozelle had established a prima facie case, the burden of production would shift to the RRB to prove one of four statutory affirmative defenses: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). The RRB relies on the defense that there is "a differential based on any other factor other than sex." *Id.*; Defs.' Br. at 26–28. According to the

RRB, Earls-Rozelle continued to be paid at the GS-13 level when the Chief position was vacant because she was not promoted to the position between January and August 2020, whereas Nathaniel Coleman had been paid at the GS-15 level prior because he had actually received the promotion to the role. DSOF ¶¶ 1, 6–7; Request for Personnel Action at 24; Earls-Rozelle Dep. at 93:3–8; Earls-Rozelle EEO Aff. at 5 (acknowledging that she was not detailed to the position of Acting Chief). Second, the RRB states that Earls-Rozelle's pay was not increased because she never requested a formal desk audit or higher pay, which could have increased her GS-level. DSOF ¶¶ 74, 90; Supp. to Earls-Rozelle EEO Aff. at 4; R. 95-13, DSOF Exh. 34, Chin Decl. ¶ 4–5. Both of those affirmative defenses relieve the RRB of any Equal Pay Act liability, and Earls-Rozelle offers nothing to rebut those defenses. The Equal Pay Act claim cannot survive summary judgment.

## IV. Conclusion

The RRB's motion for summary judgment, R. 93, is granted. The case is dismissed with prejudice, and final judgment shall be entered.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 23, 2026

36